[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action brought by Betty Ann Conroy and fifteen other grave shift dealers at Foxwoods Resort and Casino against the Foxwoods Casino Dealers' Toke Committee. The committee is an unincorporated association of dealers whose responsibility is to collect tips (tokes) for all dealers and distribute them in CT Page 14268 accordance with a certain formula to all the dealers. The plaintiff's complain that between March, 1994 and March, 1997, the grave shift dealers who acted as toke collectors were paid less than they should have been paid for that period. They claim that the committee cut their rate in half in March of 1994 in violation of the by-laws, or of their own rules and regulations or unilaterally without due regard for custom and practice.
 FACTS
(1) Toke is the term used by Foxwoods to mean tips for dealers of table games.
(2) Tips are the property of the dealers and Foxwoods Casino has no ownership interest in the tips or tokes.
(3) Members of the Toke Committee are scheduled on each shift to collect tips that are left in boxes at the tables.
(4) Committee members and assistants collect the tips from the tables and deposit them in a large box. The tips are all eventually brought to the cashiers where they are counted on a daily basis. The Committee deposits the funds into its bank account.
(5) On a weekly basis, the tips are totaled and that amount is divided by the number of hours worked that week by all of the dealers to yield an hourly "toke rate" for that week.
(6) In addition to regular wages, dealers are then paid "toke" pay for the number of hours they worked that week. For example if a dealer worked 40 hours and the toke rate for the week was $10 per hour, that dealer would receive in his or her pay $400 of toke pay (40 hours x $10 per hour).
(7) Committee collectors and assistants are paid additional toke hours for performing their collection functions. The number of toke hours to be paid for these functions is nominally set out in the Toke Committee By-Laws.
(8) Discrepancies in toke pay are handled by the Toke Committee co-chairman and normally take two to three weeks to correct, so that if a complaint about toke pay is made in one week, it may not be made up or paid out until several weeks later. CT Page 14269
(9) Foxwoods Resort and Casino opened to the public on or about February 10, 1992.
(10) At that time the dealers had formed their own Toke Committee and were operating under the provisions of by-laws contained in Exhibit D 1. However, there was no vote to adopt these by-laws by the dealers themselves. No records are available to show whether any by-laws were ever officially adopted by the dealers.
(11) Despite the fact that the by-laws may never have been officially adopted by the dealers, the Toke Committee considered the by-laws to be their governing rules and utilized the by-laws for all matters pertaining to the collection and distribution of tips, including computation of the toke rate.
(12) The by-laws provided that the grave shift collectors would be paid one toke hour per shift per week between the periods of February, 1992 and the introduction of Revised By-Laws dated June, 1992.
(13) The by-laws contained in Plaintiff's Exhibit 5 and Defendant's Exhibits 2, 3, 4 and 5 all contained similar language for the payment of day and swing shift collectors, i.e., that they would be paid three toke hours per day; it was clearly established by testimony of both plaintiff's and defendant's witnesses that the day shift collectors were actually paid three hours per area collected per day and not three hours per day as set out in the by-laws.
(14) In September of 1993, Casino Two opened, and at that time day and swing shift collectors were paid an additional three hours per shift for collecting the Casino Two room, making their potential pay nine hours per shift for collecting tips.
(15) Until September of 1993, the grave shift collectors had been paid one and a-half hours per shift for collecting tips in Casino One and the poker room.
(16) In September of 1993, when Casino Two opened, grave shift collectors began to receive one and a-half hours for collecting Casino One; one and a-half hours for collecting Casino Two; and one and a-half hours for collecting the poker room. Assistants were paid one hour for each of those areas after CT Page 14270 September, 1993. (This rate was established by the testimony of the plaintiffs, Pergiovanni, Gillis, Ratigan and affirmed by Richard Majewski who was chairman of the Toke Committee at that time and who was responsible for payment along with Rhonda Salinas who was a Toke Committee member at that time. Additionally, Brian Morley, who was chairman of the Toke Committee between 1996 and 1997 testified that his research disclosed that was the payment for grave shift collectors in 1993.)
(17) Each of the copies of the by-laws submitted into evidence by both the plaintiffs and the defendant indicate that amendment involving monetary matters must be carried out only through a majority vote of all dealers. Despite that language, it was undisputed that day and swing shift collectors were being paid three hours per area collected, although the by-laws indicated that they should be paid three hours per day.
(18) No records of votes or minutes of meetings could be found authorizing an increase or change in pay for any collectors from per day to per area collected. It appears that the Toke Committee, through its actual custom and practice, increased the payments to collectors and their assistants when the workload increased and collection areas had to be divided, thereby increasing pay to day, swing and grave collectors.
(19) However, in February or March of 1994, when grave shift collectors raised complaints concerning their toke collection rate for the same work as day and swing shift, their pay was cut in half by the Toke Committee without any vote from the dealers. Prior to this event, there had never been any vote or action by the Toke Committee to decrease the rate of any collectors or assistants, only to increase.
(20) In March of 1994, as stipulated, the rate for grave shift collectors became three quarters of an hour per area collected and one hour per area collected for assistants. This continued through March of 1997.
(21) At various times between March of 1994 and March of 1997, several of the plaintiffs complained regarding the rate of pay for grave shift collectors. Mr. Pergiovanni, Mr. Gillis, Betty Ann Conroy and others complained to the Toke Committee or to Mr. Majewski concerning the rate of pay. Mr. Pergiovanni, Mr. Gillis and Betty Ann Conroy all had filed written discrepancies CT Page 14271 during this period of time.
(22) At that time, it was Mr. Majewski's practice to accept verbal complaints of pay discrepancies inasmuch as it expedited the handling of such complaints.
(23) During this period from March, 1994 through March, 1997, the Toke Committee took up these complaints on several occasions, but never acted upon them.
(24) There was a vote of all dealers in 1996 for several matters relating to the by-laws and pay. One of the questions was to change the grave shift collectors rate from three quarters of an hour to one hour. The majority of dealers voting voted against this proposed change, however, the number of dealers voting did not constitute a majority vote of all dealers on monetary issues.
(25) Eventually, in March of 1997, based upon the continuing complaints of the grave shift collectors, Richard Majewski and Brian Morley, then both chairpersons of the Toke Committee, determined that the grave shift collectors and their assistants had, in fact, been paid the incorrect rate from March of 1994 through March of 1997 based upon this research and review of by-laws and reinstated the grave shift collectors to one and a-half hours per casino collected and their assistants to one hour per casino collected. Despite that, the grave shift collectors were not reimbursed for any loss of toke pay during that period of time.
(26) Shortly thereafter, Mr. Majewski undertook to determine what amounts the grave shift dealers would be owed for the period of time in question. To do this, he went back through all of the toke booklets and records to determine when the change in pay for grave shift collectors took place. Based upon his research, he determined that the change occurred in March of 1994.
(27) Majewski then reviewed the toke pay records for each of the grave shift collectors and assistants for that period of time. He calculated the amount owed to them by doubling the amount of collection pay they received since he had determined that their collection pay had been cut in half in March of 1994.
(28) Elections were held for the toke committee in September of 1997, and Mr. Majewski and Mr. Morley were not returned as chairpersons. At that time, Christy Newman and Richard Pullen CT Page 14272 were elected as co-chairpersons of the committee.
(29) Mr. Majewski conducted a turnover with Christy Newman after the election and provided her with records and computations for the grave collector's and assistant's lost toke collection pay.
(30) These records and calculations are contained in Plaintiff's Exhibit 1.
(31) Thereafter, Christy Newman took the information and transposed it onto a list entitled "Grave Dealers Owed." Plaintiff's Exhibit 2.
(32) On October 23, 1997, Christy Newman and Richard Pullen issued a memorandum to all dealers which was Plaintiff's Exhibit 7. Plaintiff's Exhibit 7 essentially sets forth the plaintiff's case. It clearly set forth that the grave shift dealers were paid at a rate of one and a-half take hours per casino collected until the week ending March, 1994, and that in March of 1994, the take committee voted to reduce the rate of payment for grave shift only to .75 toke hours per casino collected and assistant (bagholder) to .50 toke hours. "This constituted a reduction of fifty percent rate of pay."
 DISCUSSION
The court finds most persuasive the memorandum from Christy Newman and Richard Pullen, as chairpersons of the Toke Committee, dated October 31, 1997, in which they state that the rate for grave shift toke collectors was reduced, beginning March 26, 1994 by 50 percent. The memorandum further indicates that the payment was reduced improperly and to reinstate the original pay rates. This was implemented the week ending March 29, 1997. The chairpersons recognized that the illegal pay reduction had been in place for almost three years. The entire committee was to be prepared to vote on a cause of action and to determine the amounts owed. Plaintiff's Exhibit 7. Plaintiff's Exhibit 2 shows the amounts owed and to whom. The dealers voted against paying.
The defendant claims that the grave shift was never paid one and a-half hours per area of collection. The court disagrees. The better evidence establishes the facts set forth above. The memorandum shows that the committee itself, after extensive research, found that the pay was improperly reduced. The fact CT Page 14273 that the dealers later voted not to pay is not persuasive. No reason was given for this change in position.
The defendant claims that the case is barred by the statute of limitations, Connecticut General Statutes § 52-577, which states that no action founded upon a tort shall be brought but within three years from the date of the act or omission complained of. The court finds that this case is based upon contract and not a tort. Therefore, Connecticut General Statutes § 52-577 does not apply. However, there was a continuing cause of conduct which would toll the statute. Blanchette v. Barrett,229 Conn. 256, 275.
The defendant next claims that Connecticut General Statutes §52-596, which provides that no action for payment of wages shall be brought but within two years after the right of action accrues bars this action. The court disagrees. The claim here is not against the employer for wages, but against fellow employees in contract for a fair division of tips.
The court finds that the applicable statute of limitations here is Connecticut General Statutes § 52-576, the six-year statute for contracts. The conduct complained of was a continuing breach from March, 1994 to March, 1997.
The court, therefore, enters judgment for the plaintiff's in accordance with the list that follows.
Name of Plaintiff Amount of Claim
 Louis Pergiovanni $8,480.31 George Sterling $6,558.97 John Ratigan $1,044.52 Betty Ann Conroy $5,304.01 James Gillis $2,156.81 George Selvidio $1,874.94 William Chesters $1,021.56 Walter Swepson $1,081.17 Paul Rabtoy $ 220.55 Simon Gonzales $ 23.50 Russell Taylor $ 27.04 Robert Mattison $1,258.96 Ed Piantamuro $ 85.56 Michael Farnum $ 164.36 Howard Gravely $ 484.07 CT Page 14274 Scott Khoury $ 107.46
The court also awards interest on these amounts from March, 1997 in accordance with Connecticut General Statutes § 37-3a.
D. Michael Hurley Judge Trial Referee