[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Toward the end of 1984, Michael Millman, an employee of the defendant T.R. Paul, Inc., made presentations to directors and officers of the plaintiff People's Bank. The presentations apparently were made at the request of one or more of the members of the board, who had heard that Millman marketed deferred compensation plans. Millman had developed some expertise in the field of funding such plans through the use of life insurance policies. Although there is considerable dispute as to what the precise representations were, there is agreement that the general idea of the deferred compensation plan was that the bank would defer paying its directors[1] their fees for service, which fees were in the neighborhood of $5,000 per year. If a director participated in the plan, he would receive a series of payments at retirement age, when he presumably would be in a lower tax bracket. The bank would use the amount of the current fees to pay premiums on life insurance policies on the lives of the directors. The assumption at the time was that if fees were deferred for four years, and premiums were paid on the life insurance policies in the amount of the fees during that period of time, the policies would then become self-funding, in that the CT Page 1250 dividend and loan features of the policies would in effect pay the premiums, and the insurance would remain intact. The bank was the beneficiary of the life insurance policies, so that as directors died, it recovered the costs of the deferred payments. The theory, of course, is that the favorable tax treatment accorded life insurance allowed everyone to "win": the directors won, because they effectively received more money at a more advantageous time; the bank won, because according to projections, it actually came out ahead. Millman, T.R. Paul and New England Mutual Life Insurance Company[2], the company which sold the policies, benefitted [benefited] because of the business generated.
In order to put the dispute in context, it perhaps should be interjected immediately that there is no agreement as to precisely what was represented to the bank by Millman. The plaintiff bank claims that Millman specifically represented that there would be no need to pay premiums after the initial four-year deferral period. Millman disagrees, and asserts that it was clear that the projections which were presented to the bank clearly contained assumptions as to the return that the bank could generate on its investments. The amount of the dividend, according to Millman, could vary, and as a result the ability of the plan to "self-fund" was not necessarily guaranteed. As will be noted later, the written material circulated at the time does not entirely resolve the controversy.
In any event, approximately thirteen directors agreed to participate in the plan, and life insurance policies were purchased with funds which otherwise would have been used to pay their fees. Two years later, the tax law changed somewhat, and the necessary deferral period was extended to five years. Again, a number of directors opted into the plan, the bank purchased the policies, and life went on.
The person at the bank who administered the plan was John Medvec, the executive vice president and treasurer. By letter dated January 25, 1993, Millman informed Medvec that "due to a reduction in [New England Life's] dividend scale over the past year", premiums were due on five of the policies, for a total of $2642.96. Medvec was clearly not happy, but, after seeking guidance from the board, paid the additional amount.[3] Over the next several years the bills for premiums due increased dramatically, and the 1998 invoice for premiums was, according to the materials submitted in conjunction with the summary judgment motions, $158,286.32. CT Page 1251
The plaintiff bank brought this action against T.R. Paul, Inc. and the New England Life Insurance Company; service was effected, according to the sheriff's return of service, on June 19, 1997, and June 16, 1997, respectively. The amended complaint, with a caption date of March 12, 1999, includes five counts. The first count seeks damages for breach of contract as to both defendants. The second count alleges negligent misrepresentation as to Paul, acting as agent for New England and for itself The third count alleges that Paul, acting for itself and as agent for New England, breached a fiduciary duty to the plaintiff causing injury. The fourth count alleges that Paul, again acting for itself and as agent for New England, violated § 38a-816(1) of the General Statutes (part of the Connecticut Unfair Insurance Practices Act) and, thus, § 42-110b(a), part of the Connecticut Unfair Trade Practices Act. The fifth count seeks to enjoin New England from charging additional premiums, because of the representations allegedly made by Paul, acting for itself and as an agent of New England.
Both defendants have moved for summary judgment as to the entire complaint. Although each claim will be discussed in some detail, it may be stated as an overview New England claims that there is no genuine issue of fact regarding its contracts with the bank, and that other claims are barred be the statute of limitations. It claims that an injunction should not issue, as there is an adequate remedy at law. T.R. Paul takes similar positions, although, as will be seen, some of New England's positions are not available to it.
Summary judgment may be granted when, and only when, there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law. Section 17-49 of the Practice Book. It is the burden of the moving party to show, by pleadings and documentary materials, that there is no genuine issue of material fact and that summary judgment ought to enter in its favor; the evidence is to be viewed in the light most favorable to the nonmoving party. Miller v. United TechnologiesCorp., 233 Conn. 732, 744-45 (1995). If the moving party meets its burden, the nonmoving party then has the burden to show, through affidavits or other documentary evidence, that there is a genuine issue of material fact. If the nonmoving party produces evidence sufficient to show that a genuine issue exists, then summary judgment will not issue, but more than a mere assertion that a genuine issue exists is required. Bartha v. WaterburyCT Page 1252House Wrecking Co., 190 Conn. 8, 11-13 (1983). Even if no evidence is produced in opposition to the motion, the motion will fall if the movant's materials fall to show both that there is no genuine issue of fact and that the movant is entitled to judgment as a matter of law. Walker v. Lombardo, 2 Conn. App. 266, 269
(1984).
 I. NEW ENGLAND LIFE'S CLAIMS
A. Breach of Contract — First Count.
New England Life claims that there is no genuine issue of fact as to its claimed lack of liability on the first count of the complaint, which alleges that it and Paul, acting through Millman, breached one or more contracts. The plaintiff and New England view "the contract" entirely differently. New England views "the contract" as a series of individual insurance contracts, and cites authority accordingly. The plaintiff bank has a more expansive view of "the contract": in its view, the contract includes the deferral plan and the representations of Millman. "The contract" is, in the plaintiff's view, a multi-faceted deferral plan which included, as an essential feature, funding through New England Life policies.
I have read all of the materials submitted by the parties in support of and in opposition to the motions for summary judgment, and it seems appropriate to me first to examine each facet of the plan individually.[4] I assume, for the purpose of analysis, that Millman, an employee of Paul, made the representations which Medvec and the plaintiff claim that he made, that is, that no payments beyond the initial deferral period would be required.[5] Even if this assumption is made, however, New England argues that it is not liable for breach of contract for two related reasons: that Millman was specifically not authorized to enter into contracts on behalf of New England and that this limitation of any agency power was clearly set forth, and that, in any event, the written contract clearly stated that all of the agreements between the insured and the insurer were stated in the written contract and the insured had a grace period often days to review the policy and return it if it did not wish to proceed. The plaintiff, on the other hand, argues that oral as well as written terms can comprise an agreement, citing SteeltechBuilding Products, Inc. v. Edward Sutt Associates, Inc.,18 Conn. App. 469 (1989), and that Millman was acting with at least apparent authority from New England at the time of the CT Page 1253 representations.
The issue of agency will be addressed first. The relationships between insurers, insureds, agents and brokers are ordinarily fact driven; but as a general rule, an agent who solicits business and accepts premiums is an agent of the insurer, while a broker, who is approached by the insured and places insurance with a company, is an agent of the insured. See, e.g., 43 AmJur 2d, Insurance §§ 108-13. An agent can be an agent for both, depending on the circumstances. Id., § 111. Relevant factors include who contacted the agent, who pays the agent, who controls the agent's activities, and whose interest is protected by the agent. Id., § 110.
The plaintiff argues, at least as to the first count, that Millman was an agent of New England and that New England is accordingly bound by Millman's statements. Because the issue is not entirely clear, and the issue is addressed in the context of a motion for summary judgment, I will resolve the issue in favor of the nonmoving party and will assume that, generally, Millman was the agent of New England. This does not end the inquiry, however, because a company can effectively limit the authority of its agents, if the limitation is clear and made known to the insured. See O'Connor v. Metropolitan Life Insurance Co.,121 Conn. 599, 601 (1936); see also Weeks v. Mutual of New York,601 So.2d 998 (Ala.App. 1991) (life insurer not liable for misstatements of agent made outside of the agent's authority);Columbia Mutual Casualty Co. v. Ingraham, 896 S.W.2d 903 (Ark. 1995) (oral agreement to insure by a soliciting agent[6] is not enforceable); Fowler v. Prudential Property Casualty Co.,449 S.E.2d 157 (Ga.App. 1994) (an agent's oral misrepresentation regarding a grace period for payment does not bind the insurer where he had no actual authority to do so and the policy clearly provided that there was no grace period); Sarnafil Inc. v.Peerless Insurance Co., 636 N.E.2d 247 (Mass. 1994) (where a policy is clear and unambiguous, an insured business is not entitled to rely on an agent's statement to the contrary).
The policies at issue have been included with the materials submitted in support of the motion for summary judgment. The policy very clearly includes the application (at § 3 "Contract" ¶ 1); the application very clearly states: "Limitation on Authority of Agents and Examiners. Agents and Examiners do not have authority: . . . (b) to change any terms of this Application, or © to make a contract for the Company." CT Page 1254 The contract itself very clearly states that the premium is to be paid "for life". There is in the contract, of course, an option for paying premiums from dividend accumulations and policy loans (at § 4, "Premiums"); this is the feature which allowed for the policies to remain in effect until the mid-nineties without the payment of premiums for a number of years.
Although of course it is true that in some contexts both oral and written terms can comprise a contract; see Steeltech, supra; it is also true that in this specific case the insurer effectively restricted any authority which Millman may have had, so that the insured was not entitled to enforce any of Millman's representations as to New England. The policy clearly stated (at § 3, "Contract") that "[t]he policy [with attachments] is the entire contract between you and the Company." Because there is no genuine issue of fact left, it is clear that the plaintiff cannot recover against New England for breach of contract because of Millman's representations. The insured had a ten day grace period in which to read the policy and return it if it was not satisfied with the terms; the fact that it chose not to read the policy is immaterial. See, e.g., Small Agency v. Dugay, 4 Conn. Cir. 710 (1967).
No claim is made that New England breached the contract as written. Summary judgment may be granted in favor of New England as to the first count of the complaint.
B. Negligent Misrepresentation — Second Count.
The second count sounds in negligent misrepresentation. The gravamen of the complaint is that the defendant Paul, acting through its employee Millman, both for itself and on behalf of New England Life, negligently misrepresented that the policies would be self-funding after the initial deferral period and that the plaintiff bank, having acted in reliance on the misrepresentation, has been and/or will be required to make payments far greater than the amount contemplated at the time of the contract.
New England Life claims that any possible action for negligent misrepresentation against it is barred by § 52-577 of the General Statutes, which states that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of" The plaintiff apparently agrees that § 52-577 is the appropriate statute of limitations, but CT Page 1255 argues that the continuing course of conduct doctrine has tolled the running of the statute.
First, it is clear that § 52-577 is an occurrence statute of limitations as opposed to an accrual statute; that is, the time period runs from the actual act or omission rather than from the date of injury. See, e.g., S.M.S. Textile Mills, Inc. v.Brown, Jacobson, Tillinghast, Lahan and King, 32 Conn. App. 786,790 (1993); compare § 52-576 of the General Statutes. Ordinarily, ignorance of the fact of damage does not toll the running of the statute; see Kennedy v. Johns Manville Corp.,135 Conn. 176, 180 (1935); and the fact that injury has not yet occurred will not, in the absence of statutory or constitutional exception, toll the running of an occurrence statute. See Ficherav. Mine Hill Corporation, 207 Conn. 204, 212 (1988). The plaintiff argues that the statute is tolled by the continuing course of conduct or continuing duty doctrine.
If the wrong sued upon is a breach of a continuing duty, then the statute is tolled until the duty no longer exists or some other event terminates the period. In Handler v. Remington ArmsCo., 144 Conn. 316 (1957), one allegation was that the defendant failed to warn of faulty ammunition, which caused injury. Because the alleged failure to warn has no specific date attached to it, but rather proceeds on in time somewhat indefinitely, the court held that the statute of limitations did not bar the action, on the facts of that case. A medical doctor's alleged failure to diagnose or to treat can, in some circumstances, fall into a such a continuing course of conduct category. See Starkweather v.Patel, 34 Conn. App. 395, 400-02 (1994). Thus, in one variant of the theory, the statute is tolled because the wrong, typically an omission such as failure to warn, has no specific date attached to it, but, rather, the omission still continues.
A related variant occurs where a special relationship exists between the parties giving rise to a continuing duty or there is later conduct related to the prior act. See Sanborn v. Greenwald,39 Conn. App. 289 (1995). In such a "special relationship", lawsuits may be premature because specific actions within the relationship may be difficult to identify and, if the relationship continues, there may be opportunities to remedy the wrong. Sanborn, supra, at 295. If, on the other hand, a specific act is completed and any warning would not be effective because the damage, if any, is done, then the statute is not tolled and the time period begins with the original claimed malfeasance. CT Page 1256Sanborn, supra, at 297.
In Sanborn itself, the claim was that a lawyer had negligently drafted a document in the divorce context; the claimed error was discovered years later when it proved to be ineffective. The plaintiff claimed that, because of the "special relationship" of attorney-client, there was in effect a continuing duty to notify of the alleged error. The court held that there was no continuing duty, especially after the specific relationship had ended, and, as a practical matter, the document presumably could not be taken back. Unless there was some evidence that the defendant learned of his negligence in the meantime, there was no tolling of the statute of limitations.[7]
Similarly, in S.M.S. Textile Mills Inc. v. Brown, Jacobson,
supra, the claim was made that the plaintiff and the law firm had a "special relationship" which would toll the statute of limitations. Again, however, it was held that there was no continuing course of conduct where the attorney-client relationship was finite, and the last act or omission occurred at such a time that suit was barred by the statute of limitations.
A variation of the continuing duty occurred in Beckenstein v.Potter Carrier, 191 Conn. 150 (1983). The issue was when had a contract been completed; ordinarily, in the context of contract, the cause of action is complete and the action accrues when the injury is inflicted, if there is a continuing duty, for example where a contractor is still in control of the work so that the problem might be remedied, then the statute may not begin to run until the course of conduct, in this case work on the project, is completed. Id., at 156, 161.
The continuing course of conduct rubric was restated inBlanchette v. Barrett, 229 Conn. 256 (1994). In Blanchette, the issue was whether the doctor-patient relationship created a continuing course of conduct such that the statute of limitations was tolled: is there a breach of duty existing after the commission of the original wrong? The court held that on the facts of the case, in order to find a continuing duty one would have to find an on-going physician-patient relationship; negligence at some point; and some kind of treatment or requiredconduct after the original act of negligence. Because one of the claims in Blanchette was a failure to monitor the plaintiff's condition after a diagnosis, then the statute could be tolled for a period. Id., at 278. There is, of course, a strong analogy to CT Page 1257 the claim of failure to warn, as in Handler, supra, because of the indefinitely continuing nature of the allegation itself. InBlanchette, however, there was no duty to correct a diagnosis in the absence of evidence that the physician subsequently learned of an error. Blanchette, supra, 284.
There appear to be two related themes which underlie the case law. A continuing duty may arise where the claimed breach of duty is an omission and is temporally indefinite. Examples include the physician's alleged duty to monitor a condition and a manufacturer's alleged failure to warn of a product defect. The second sort of duty, the continuing course of conduct, may occur where a number of acts occur in the course of a relationship, and the statute does not begin to run until the last act in a particular course of conduct is committed or, if that point is difficult to determine, the statute may begin to run when the relationship is terminated. Under either theory, the required analysis is "conspicuously fact-bound." Sanborn, supra, 295.
The alleged misrepresentations occurred in 1984 and, perhaps, 1986, and this action was served in 1997. Unless some sort of exception is found, the action is obviously barred by §52-577 of the General Statutes. The language of the second count contains no language evocative of a continuing duty, such as a duty to warn or to monitor. In order to decide whether it would be possible to find the existence of a continuous course of conduct, I will construe the facts in a manner most favorable to the nonmoving party. After the alleged misrepresentations were made, no later than 1987, there may arguably have been a continuing relationship in that the defendant Paul monitored the situation. Had Millman not been "in the loop", for example, he would not have written the 1993 letter advising of the need to pay a premium.[8] After the 1993 letter, however, there can be no misapprehension on the part of the plaintiff as to the nature of the contracts and any course of conduct on the part of Millman, at least as to the self-funding nature of the plan, would be completed.[9] Even if there had been some opportunity to correct the error, from the plaintiff's point of view, it was clear that after January 25, 1993, that error would not be corrected.
Interpreting the facts most favorably to the plaintiff may result in the starting point for the statute of limitations being deemed to be January 25, 1993.[10] There is no alleged misrepresentation after that time, and the positions of the CT Page 1258 parties were then clear. If there had been a duty to warn, for instance, the warning appeared in the letter.[11] The period in which to bring a lawsuit expired, then, in January, 1996, well before this action was served. The second count is, then, barred by the statute of limitations.
C. Breach of Fiduciary Duty — Third Count.
The parties have treated the third count, an alleged breach of fiduciary duty, on the same terms and with the same arguments as the second count. Seeing no reason to differ,[12] I will grant summary judgment on the third count on the ground that the statute of limitations bars the claim.
D. CUIPA and CUTPA — Fourth Count.
The fourth count alleges violations of § 38a-816(1) (Connecticut Unfair Insurance Practices Act) and § 42-110b(a) (Connecticut Unfair Trade Practices Act). The defendant asserts, and the plaintiff does not appear to dispute, that in the circumstances of this case there is no private right of action created by CUIPA, but that a violation of CUIPA may be an unfair trade practice actionable pursuant to § 42-110b(a) of the General Statutes ("CUTPA"). The statute of limitations pertaining to actions brought pursuant to § 42-110b(a) is §42-110g(f), which provides that any action must be brought not later than three years "after the occurrence of a violation of this chapter." The pertinent statute of limitations is, then, an occurrence statute rather than an accrual statute.
Where claims of misrepresentation or fraud are brought pursuant to CUTPA, the statute runs from the time of the alleged misrepresentation, not the injury or discovery. See Fichera v.Mine Hill Corporation, 207 Conn. 204, 213, 216 (1988). Even if one of the doctrines extending the period applied, the statute would begin running no later than January, 1993, pursuant to the reasoning above. Summary judgment is granted in favor of New England as to the fourth count.
E. Promissory Estoppel — Fifth Count.
The fifth count alleges that New England is estopped from denying a contractual relationship because it made, through Paul, a promise reasonably expected to induce reliance and that the plaintiff relied on the promise to its detriment. See, e.g., CT Page 1259Wellington Systems, Inc. v. Redding Group. Inc.,49 Conn. App. 152 (1998). The count claims injunctive relief in the form of an order that the defendant continue policies in effect without the payment of premiums.
Summary judgment may be granted as to the count in favor of the defendant New England[13] for two reasons. First, any promise made was not the promise of New England. As discussed above, even if Millman and Paul were agents of New England for some purposes, they were not agents for the purpose of entering into contracts, and the limitation on the authority was clearly made such that Millman and Paul had no apparent authority in that regard. Further, in the specific context of promissory estoppel, the person claiming estoppel must show due diligence and show that he lacked a reasonable available means of acquiring knowledge of the true state of affairs. Wellington Systems, supra. In this case, of course, the plaintiff could have read the policies or made further inquiries, and there is no genuine dispute as to this issue.
Second, there is an adequate remedy at law such that an injunction ought not issue. Cahill v. Board of Education of theCity of Stamford, 187 Conn. 94 (1982). If there is indeed a sustainable case of promissory estoppel, then the array of contractual remedies exist, including money damages and perhaps specific performance. Ordinarily, of course, monetary loss by a commercial institution is not irreparable harm.
 II. T.R. PAUL'S CLAIMS
A. Breach of Contract — First Count.
T.R. Paul claims that summary judgment ought to be granted in its favor as to the first count for several reasons. The first count, it will be recalled, alleges that T.R. Paul, acting through its employee Millman, entered into a contractual arrangement with the plaintiff bank such that the bank entered into a deferred payment arrangement with its directors and financed the plans through life insurance contracts purchased from New England Life. The complaint alleges that Millman represented that the only cost to the bank would be the deferred fees of four years, as to the first set of deferred payment agreements, and five years as to the second set.
T.R. Paul asserts, first, that there was no contract between it CT Page 1260 and the bank; rather, the only contracts were between the bank and New England Life. The complaint alleges, however, that Millman sold the bank two "Directors' Voluntary Deferral Plans", with a number of features, presumably for the consideration of commissions. There is, at the least, a genuine issue of fact as to whether the contract as alleged by the bank existed. The "contract", of course, need only be an agreement, and is not necessarily a single signed document.
T.R. Paul's second position is that if there was an agreement, it was an oral agreement that could not be performed within one year, and thus was unenforceable by virtue of the Statute of Frauds, § 52-550(a)(5) of the General Statutes.[14] I find that there are several issues of fact which militate against the granting of summary judgment on the ground of the Statute of Frauds.
First, the materials submitted by the parties include the written materials circulated by Millman at the time the plans were discussed and adopted. The cover sheet is on letterhead of T.R. Paul and, in typing, it states: "Prepared by: Michael L. Millman, Vice President, Sales Marketing". The materials in the depositions show beyond cavil that the description is genuine and generally describes the plan sold, along with financial illustrations and projections. The finder of fact may determine that the writing satisfies the requirements of the statute of frauds. See Deep River National Bank's Appeal, 73 Conn. 341, 346
(1900) (a typewritten document "signed" with a rubber stamp, combined with testimony as to the circumstances of the creation of the document, was sufficient to remove the agreement from the Statute of Frauds). The letter of Millman dated January 25, 1993, discussed at length above, is signed and may be interpreted as at least referring to the agreement.
Second, there is an issue of fact as to whether performance by the plaintiff removes the contract from the statute. Whether performance is sufficient is a question of fact. Milazzo v.Schwartz, 44 Conn. App. 402, 407 (1997). If the performance, partial or otherwise, clearly is taken in reference to the agreement so that an obvious inequity would occur if the contract were held to be unenforceable, the statute will not bar enforcement. Milazzo v. Schwartz, supra; Ubysz v. DiPietro,185 Conn. 47 (1981); Padula v. Padula, 138 Conn. 102 (1951). "[We have held acts sufficient to remove a contract from the operation of the statute] if they are such as clearly refer to some CT Page 1261 contract in relation to the matter in dispute, the terms of which may be established by parol. . . . [B]efore evidence of the terms of the verbal agreement becomes admissible, there must be shown facts of such a character as to be naturally and reasonably accounted for in no other way than by the existence of some contract in relation to the subject matter." Rienzo v. Cohen,112 Conn. 427, 429 (1930).
In the case at hand, the plaintiff has submitted materials suggesting that performance on its part was completed, in whole or in part,[15] with the execution of the deferral contracts with its directors and the sets of four-year and five-year payments of premiums to New England, of which T.R. Paul presumably received some share. Issues of fact, then, remain as to the issue of the Statute of Frauds.[16]
T.R. Paul also claims that the three year statute of limitations[17] as to oral contracts applies, so that the action is barred. For many of the same reasons as apply to the argument regarding the statute of frauds, I find genuine issues of fact. The writings and memoranda, including the letter of January 25, 1993, may be found to constitute sufficient documentation to remove the issue from § 52-581; see Foley v.Huntington Co., 42 Conn. App. 712 (1996); similarly, performance by the plaintiff may compel the conclusion that the contract is not purely executory, and thus is governed by § 52-576. SeeCampbell v. Rockefeller, 134 Conn. 585, 588(19).
If the contract is governed by § 52-576, then the action must be brought "within six years after the right of action accrues." Genuine issues of fact exist concerning when the action accrued. Generally, a cause of action accrues when it may first be maintained by the plaintiff. If the nonmoving party receives the benefit of inferences, it may be that the cause of action accrued on or after January 25, 1993. Summary judgment will not enter as to count one.
B. Counts Two, Three and Four.
The facts and reasoning applied to these counts above apply with equal force to the motion brought by T.R. Paul. In short, any misrepresentation, breach of fiduciary duty or CUTPA violation must have occurred no later than January, 1993, and as each of the three counts is governed by a three-year statute of limitations, summary judgment shall enter in favor of T.R. Paul CT Page 1262 as to these counts. Any tolling arising from a continuing duty or a continuing course of conduct would have terminated no later than January, 1993.
 CONCLUSION
Summary judgment may enter as to all counts in favor of the defendant New England Life. Summary judgment may enter as to counts two, three and four in favor of T.R. Paul, but is denied as to count one.
Beach, J.