## ROBERTA ANN SHERWOOD *v.* DANBURY HOSPITAL (SC 16085)

McDonald, C. J., and Borden, Katz, Palmer, Sullivan, Lavery and Flynn, Js.

---

Argued November 3, 1999—officially released February 29, 2000

*Carey B. Reilly*, with whom was *Michael P. Koskoff*, for the appellant (plaintiff).

*Donald W. O'Brien*, with whom was *Amy F. Goodusky*, for the appellee (defendant).

*Opinion*

SULLIVAN, J. The plaintiff, Roberta Ann Sherwood, appeals[1] from the judgment of the trial court rendered following the granting of summary judgment for the defendant, Danbury Hospital (hospital). On appeal, the plaintiff claims that the trial court, in granting the defendant's motion for summary judgment, improperly concluded that the plaintiff's action was barred by the three year statute of repose contained in General Statutes § 52-584.[2] The plaintiff also claims that the trial court improperly granted the defendant's motion to strike her claim that the defendant had committed unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the Connecticut Unfair Trade Practices Act (CUTPA). See General Statutes § 42-110b (a).[3]

We conclude that there is a genuine issue of material fact as to whether the statute of repose in § 52-584 was tolled by the continuing course of conduct doctrine;

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 52-584 provides in relevant part: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, *and except that no such action may be brought more than three years from the date of the act or omission complained of . . . .*" (Emphasis added.)

[3] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

see, e.g., *Blanchette* v. *Barrett*, 229 Conn. 256, 275–77, 640 A.2d 74 (1994); based on the defendant's continuing wrongful conduct.[4] Accordingly, we reverse that part of the trial court's judgment granting the defendant's motion for summary judgment. We conclude, however, that the trial court properly granted the defendant's motion to strike the plaintiff's CUTPA claim and, accordingly, affirm that part of the trial court's judgment striking the plaintiff's claim under CUTPA. Because we reverse that part of the trial court's judgment granting summary judgment in favor of the defendant, we do not decide the other issues pertaining to the granting of the defendant's motion for summary judgment that the plaintiff raises in her appeal.[5]

The record reveals the following pertinent facts and procedural history. On March 2, 1985, the Food and Drug Administration approved the enzyme-linked immunosorbant assay test (ELISA test) for the purpose of screening units of blood for antibodies associated

---

[4] Although the record reveals that the plaintiff clearly raised this claim before the trial court, the trial court's memorandum of decision is not perfectly clear with respect to whether it considered this legal argument in granting the defendant's motion for summary judgment. The record, however, is adequate to review the plaintiff's claim and, accordingly, we review it.

[5] Specifically, we do not address the following issues raised by the plaintiff: (1) whether the trial court improperly granted the defendant's motion for summary judgment when the plaintiff's claim of breach of a fiduciary duty was not barred by § 52-584; (2) whether the trial court improperly granted the defendant's motion for summary judgment based on the three year statute of repose in § 52-584 when the statute violated the plaintiff's rights to redress an injury and due process under the state constitution, and the plaintiff's rights to equal protection under both the federal and state constitutions; (3) whether the three year statute of repose in § 52-584 was tolled under the continuing course of conduct doctrine based on a special, fiduciary relationship between the parties that gave rise to a continuing duty; (4) whether the three year statute of repose in § 52-584 was tolled under General Statutes § 52-595 because the defendant fraudulently concealed from the plaintiff her cause of action; and (5) whether the three year statute of repose in § 52-584 was tolled by the discovery rule until the plaintiff discovered the essential elements of her cause of action.

with the human immunodeficiency virus (HIV). Ramon Kranwinkel, a pathologist and hematologist, who, at all relevant times, was the director of the blood bank at the hospital, testified in a deposition that he had learned of the Food and Drug Administration's ratification of the ELISA test "sometime in 1985, earlier that year, probably around February, but [was] not sure of the exact date."

On April 18, 1985, Dennis Ogelia, the plaintiff's treating physician, admitted the plaintiff to the hospital for the treatment of congenital scoliosis. The next day, April 19, 1985, the plaintiff underwent a posterior spinal fusion during which she received four units of blood. The blood was provided to the hospital by the American Red Cross (Red Cross), and had an expiration date of April 22, 1985.

The plaintiff, in an uncontroverted affidavit, swore that, prior to her surgery: (1) she "did not know of the risk of contracting HIV from a blood transfusion and [that] the [d]efendant did not inform [her] of [that] risk"; (2) she "did not know that [she] had the option [of banking her] own blood for the surgery and [that] the [d]efendant did not tell [her] of [that] option"; (3) she "was not aware that there was a test to detect the presence of . . . HIV [antibodies] in blood"; (4) she "did not know that [she] was given untested blood"; and (5) "no one ever told [her] that [she] could [have] postpone[d] [the] surgery until tested blood was available."

Kranwinkel testified that neither he nor anyone else from the hospital blood bank had told the plaintiff, prior to surgery, that the ELISA test was available for screening blood for the presence of HIV antibodies. Kranwinkel further testified that when the plaintiff was transfused, he had assumed that the blood had not been tested for the presence of HIV antibodies.

On, or shortly after, April 20, 1985, the day after the plaintiff's transfusion, Kranwinkel received a letter from the Red Cross. The letter stated that, "effective April 22, 1985, all units of whole blood and blood components routinely distributed by the American Red Blood Services, Connecticut Region, will have been determined to be nonreactive when tested for [antibodies associated with HIV]." The letter requested the hospital blood bank to "promptly return" to the Red Cross all units of blood remaining in its inventory that had not been tested for HIV antibodies. Kranwinkel testified that the hospital blood bank had complied with this request. Kranwinkel further testified that, had the plaintiff not received the units of blood that were used during her transfusion, those units would have been among the units returned to the Red Cross.

The plaintiff was discharged from the hospital on May 14, 1985. There was no evidence that the relationship between the plaintiff and the defendant continued after she was discharged.

On September 1, 1994, following a routine blood test ordered by Micheline Williams, the plaintiff's physician, the plaintiff learned for the first time that she had contracted HIV. An investigation ensued, through which the plaintiff learned, for the first time, on March 14, 1995, that the source of her HIV infection was contaminated blood administered to her during the April 19, 1985 transfusion.

The plaintiff's uncontroverted affidavit also contained numerous, specific factual statements regarding the absence of any information given by the defendant to the plaintiff following the transfusion. She swore that "at no time" did the defendant tell her that: (1) "the ELISA test was available at the time of [her] surgery"; (2) "the blood [that she] was given during surgery was not tested for the presence of HIV [antibodies]"; (3)

"the blood [that she] was given [during] surgery [had been] 'recalled' by the Red Cross"; and (4) "[she] could have postponed her surgery . . . a few days" until tested blood became available.

The plaintiff also submitted, in opposition to the defendant's motion for summary judgment, an uncontroverted affidavit from Elizabeth Donegan, a physician who, from 1985 to 1991, had been in charge of operating a blood bank at a hospital affiliated with the University of California at San Francisco, a community with a large population infected with HIV. Donegan was retained as an expert witness by the plaintiff and stated in her sworn affidavit that: (1) she directed a program at her hospital between July, 1987, and October, 1987, "to notify all persons who had been recipients of untested blood dating back to approximately the time [her hospital] was aware of the . . . presence [of HIV] in [the] community"; and (2) in March, 1987, "the Center for Disease Control . . . issued a recommendation that recipients of multiple transfusions between 1978 and late spring of 1985 be advised that they were at risk for . . . HIV . . . infection and [be] offered HIV antibody testing."

The plaintiff filed this complaint on July 9, 1996, alleging in the first count that the defendant had been negligent,[6] and, in the second count, that the defendant had

---

[6] The plaintiff's original complaint, as well as her substituted complaint, alleged that the defendant "was negligent in at least one of the following ways, some or all of which may be continuing, in that the [d]efendant:

"a. administered blood to the [p]laintiff that was contaminated with HIV;

"b. administered blood to the [p]laintiff that had not been tested for the presence of HIV;

"c. administered blood to the [p]laintiff that had not been tested for the presence of HIV when tested blood was available for administration;

"d. failed to test the blood given to the [p]laintiff for the presence of HIV;

"e. failed to confirm that the blood which it administered to the [p]laintiff had been adequately tested for the presence of HIV;

"f. failed to adopt an adequate system of quality assurance to monitor the quality of blood being given to patients of the [d]efendant; including the [p]laintiff;

committed unfair or deceptive acts or practices in the conduct of trade or commerce in violation of CUTPA.[7] The trial court, *Grogins, J.*, granted the defendant's motion to strike the plaintiff's CUTPA claim. The plaintiff reserved her right to appeal the trial court's decision to strike that count, and that ruling forms one basis for the plaintiff's appeal.

In her substituted complaint, the plaintiff repeated her allegations sounding in negligence; see footnote 6 of this opinion; and eliminated her CUTPA claim in accordance with the trial court's ruling on the defendant's motion to strike. The defendant answered the plaintiff's substituted complaint, and pleaded a special defense, namely, that the statute of repose in § 52-584 barred the plaintiff's negligence claim.

The trial court, *Radcliffe, J.*, concluded that, because the plaintiff's action had been filed on July 9, 1996, more than eleven years following the blood transfusion

"g. failed to adopt an adequate infection control program to prevent the acquisition and/or administration of blood that had not been tested for, or was contaminated with, HIV;

"h. failed to adopt adequate rules, regulations and protocols for the screening of blood;

"i. failed to warn the [p]laintiff that the blood had not been tested for the presence of HIV;

"j. failed to warn the [p]laintiff of the risk of contamination of HIV;

"k. failed to advise the [p]laintiff or her physician to postpone elective surgery until safe blood became available;

"*l.* failed to advise the [p]laintiff of her option to obtain [a] homologous blood transfusion through a 'directed donation' program;

"m. failed to advise the [p]laintiff that both tested and untested blood were available for administration;

"n. failed to advise the [p]laintiff that the ELISA test was available for testing blood for the presence of HIV; [and]

"o. failed to advise the [p]laintiff that she had been administered blood contaminated with HIV and/or that she, therefore, had a risk of infection with HIV."

[7] The plaintiff alleged that the actions of the defendant "constitute unfair or deceptive acts or practices in the conduct of a trade or commerce in violation of . . . § 42-110b."

that she received at the hospital on April 19, 1985, the statute of repose in § 52-584 barred her negligence claim. Accordingly, the trial court granted the defendant's motion for summary judgment on the remaining negligence count and rendered judgment thereon. This conclusion forms a second basis for the plaintiff's appeal.

I

## THE SUMMARY JUDGMENT

We first consider whether the trial court properly granted the defendant's motion for summary judgment. Specifically, we consider the plaintiff's claim that there is a genuine issue of material fact as to whether the statute of repose in § 52-584 was tolled by the continuing course of conduct doctrine based on the defendant's alleged wrongful conduct after the plaintiff's transfusion.

"The standard of review of a trial court's decision to grant summary judgment is well established. [W]e must decide whether the trial court erred in determining that there was no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Rytman*, 241 Conn. 24, 37, 694 A.2d 1246 (1997). "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The test is whether a party would be entitled to a directed verdict on the same facts." (Internal quotation marks omitted.) *Serrano* v. *Burns*, 248 Conn. 419, 424, 727 A.2d 1276 (1999).

The plaintiff claims that the trial court improperly concluded that the three year statute of repose in § 52-584 barred her negligence claim. That statute provides

in relevant part that "[n]o action . . . caused by negligence . . . or by malpractice of a . . . hospital . . . *may be brought more than three years from the date of the act or omission complained of . . . .*" (Emphasis added.) The plaintiff contends that "[t]he defendant's acts of negligence continued long after, and related to, the original transfusion . . . ." The plaintiff claims the continuing course of conduct doctrine thus tolled the commencement of the running of the three year period under the statute of repose in § 52-584 until March 14, 1995, when the plaintiff first learned that she had suffered actionable harm. The plaintiff further argues that, because she brought this action against the defendant on June 11, 1996,[8] it was timely commenced.

The defendant claims, to the contrary, that the three year period began to run in May, 1985, when the plaintiff was discharged from the hospital. Although the defendant recognizes that, under some circumstances, the continuing course of conduct doctrine serves to toll a statute of limitations, it disclaims the applicability of the doctrine in this case.

### A

We begin by noting the relevant " 'date of the act or omission complained of,' as that phrase is used in § 52-584, is 'the date when the negligent conduct of the defendant occurs and . . . not the date when the plaintiff first sustains damage.' " *Blanchette* v. *Barrett*, supra, 229 Conn. 265. This court has recognized, however, that a statute of limitations[9] "may be tolled under the . . .

---

[8] Although the plaintiff claims in one part of her brief that her action was brought on June 11, 1996, the record reveals that the action was brought on July 9, 1996. This discrepancy is without consequence for purposes of our analysis.

[9] Although this court occasionally has referred to the statutory language in § 52-584 that "no such action may be brought more than three years from the date of the act or omission complained of" as part of the "statute of limitations" contained in § 52-584; see, e.g., *Blanchette* v. *Barrett*, supra, 229 Conn. 274; this restrictive language in § 52-584 has been referred to more precisely as the "repose section of the statute of limitations." Id., 258; see

continuing course of conduct doctrine, thereby allowing a plaintiff to commence his or her lawsuit at a later date. See, e.g., *Connell* v. *Colwell*, 214 Conn. 242, [254–55], 571 A.2d 116 (1990); *Fichera* v. *Mine Hill Corp.*, 207 Conn. 204, 209–10, 541 A.2d 472 (1988); *Cross* v. *Huttenlocher*, 185 Conn. 390, 400, 440 A.2d 952 (1981); *Handler* v. *Remington Arms Co.*, 144 Conn. 316, 321, 130 A.2d 793 (1957) . . . ." (Citations omitted.) *Blanchette* v. *Barrett*, supra, 265–66.

"[W]e have held that in order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties[10] giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. *Fichera* v. *Mine Hill Corp.*, supra, 207 Conn. 209–10 (no evidence to support continuing duty on part of defendant after property sold); see, e.g., *Connell* v. *Colwell*, supra, 214 Conn. 242 (improper reliance on theory [by plaintiff in medical malpractice action]); *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 150, 464 A.2d 18 (1983) (no

also id., 258 n.1. Likewise, in this case, the repose section of § 52-584 is at issue.

[10] The plaintiff argues that the continuing course of conduct doctrine is applicable in this case both because of the defendant's later wrongful conduct and because of the existence of a special relationship between the plaintiff and the defendant. Because we conclude that a genuine issue of material fact exists as to whether the defendant's later allegedly wrongful conduct tolled the statute of repose, we do not consider whether a special relationship existed between the parties that could serve to toll the statute of repose.

continuing duty on defendant's part after completion of roof installation); *Prokolkin* v. *General Motors Corp.*, [170 Conn. 289, 299, 365 A.2d 1180 (1976)] (continuing course of conduct theory inappropriate in strict product liability action); *Handler* v. *Remington Arms Co.*, supra, 144 Conn. 316 (applying continuing course of conduct doctrine to toll statute of limitations on . . . basis of continuing duty to warn of defective cartridge by manufacturer); *Vilcinskas* v. *Sears, Roebuck & Co.*, [144 Conn. 170, 174, 127 A.2d 814 (1956)] (continuing course of conduct inapplicable where act completed by sale of air rifle)." (Internal quotation marks omitted.) *Blanchette* v. *Barrett*, supra, 229 Conn. 275–76.

Therefore, a precondition for the operation of the continuing course of conduct doctrine is that the defendant must have committed an initial wrong upon the plaintiff. In this case, the plaintiff claims that the defendant was negligent by failing to inform her of the risks associated with the blood it was supplying for her blood transfusion. See footnote 6 of this opinion. In *Zichichi* v. *Middlesex Memorial Hospital*, 204 Conn. 399, 528 A.2d 805 (1987), we stated that "[t]he delivery of a service, such as providing a blood transfusion, requires the provider of that service to exercise reasonable care to avoid injury to the consumer of the service. If a plaintiff can show that the defect in the blood could reasonably have been detected or removed, the plaintiff may well be entitled to recover for the supplier's negligent failure to detect or remove the defect." Id., 410.

A second requirement for the operation of the continuing course of conduct doctrine is that there "must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto." (Internal quotation marks omitted.) *Blanchette* v. *Barrett*, supra, 229 Conn. 275. This court has held this requirement to be satisfied when there was "wrongful conduct of a defendant related to the

prior act." (Internal quotation marks omitted.) Id. Specifically, in determining whether the continuing course of conduct doctrine applies to toll the repose section of the statute of limitations in § 52-584, we have held twice, in the medical treatment context, that continuing "wrongful conduct may include acts of omission as well as affirmative acts of misconduct . . . ." Id., 264 (doctor's failure to monitor patient after initial misdiagnosis was continuing course of conduct that tolled statute of limitations); see also *Cross* v. *Huttenlocher*, supra, 185 Conn. 400 ("[b]ecause [a physician's] negligent failure to warn [concerning the potential adverse effects from taking a particular drug] is a continuing course of conduct, the statute of limitations does not begin to run until the course of conduct is completed"); cf. *Handler* v. *Remington Arms Co.*, supra, 144 Conn. 321 (manufacturer's failure to perform its continuing duty to warn purchasers of defective gun cartridge tolls statute of limitations).

Finally, in *Blanchette* and *Cross*, the plaintiffs presented expert testimony that the defendants' omissions amounted to a breach of the standard of care. See *Blanchette* v. *Barrett*, supra, 229 Conn. 279 ("[t]he testimony of the plaintiff's expert witness . . . which the jury might have found credible, was sufficient for the jury to find not only . . . a continuing duty on the part of the defendant . . . but also continuing negligence on the part of the defendant based upon a breach of his professional duty of care to the plaintiff"); *Cross* v. *Huttenlocher*, supra, 185 Conn. 402 (plaintiff presented expert testimony that, "if credited by the jury, could have been sufficient to make out a case of negligent failure to warn"). In this case, we have such evidence.

## B

We must determine, therefore, in light of this case law and evidentiary record, whether it was proper for

the trial court to have granted the defendant's motion for summary judgment. Specifically, we must determine whether there is a genuine issue of material fact with respect to whether the defendant: (1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the original wrong; and (3) breached that continuing duty.[11]

We first consider whether there is a genuine issue of material fact with respect to whether the defendant committed an initial wrong upon the plaintiff. It is undisputed that: (1) prior to the plaintiff's transfusion, the Food and Drug Administration approved the ELISA test for screening units of blood for HIV antibodies; (2) Kranwinkel testified that he assumed that the plaintiff had been administered untested blood; and (3) no one from the hospital blood bank informed the plaintiff, prior to surgery, that the ELISA test was available for screening blood for the presence of HIV antibodies. Because a hospital that supplies blood for a transfusion must "exercise reasonable care to avoid injury to the [recipient of the blood]"; *Zichichi* v. *Middlesex Memorial Hospital*, supra, 204 Conn. 410; a hospital may be liable for negligently failing to inform a patient of the risks associated with the blood it has supplied for a transfusion. Therefore, we conclude that there was a genuine issue of material fact with respect to whether the defendant committed an initial wrong upon the plaintiff by failing to inform her that the blood with which she was transfused had not been screened.[12]

---

[11] Although "[t]hat duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong"; *Blanchette* v. *Barrett*, supra, 229 Conn. 275; there is no evidence suggesting that the duty had terminated in such a manner in this case.

[12] Because the plaintiff's allegations relating only to the hospital's continuous failure to inform her of the risks related to the transfusion are relevant to the determination of whether the continuing course of conduct doctrine applies in this case, we express no view as to the plaintiff's other allegations supporting her claim of negligence. See footnote 6 of this opinion.

We note, however, that, under the continuing course of conduct doctrine, the plaintiff's cause of action is not limited to the damages that flow from

We next consider whether there was a genuine issue of material fact with respect to whether the defendant owed the plaintiff "a duty that remained in existence after commission of the original wrong related thereto." *Blanchette* v. *Barrett*, supra, 229 Conn. 275. The plaintiff presented an affidavit from Donegan, a medical expert who stated that she oversaw a program at a hospital blood bank that notified persons who had been administered blood untested for HIV antibodies. She also stated that she "felt that it was good medical practice to institute this program at the hospital." Thus, the plaintiff presented evidence from which a reasonable jury could have found that the standard of care required the defendant to have taken steps to notify the plaintiff, after the transfusion, that the blood that she received during her transfusion was not tested for HIV antibodies.

Therefore, as in *Blanchette* and *Cross*, the plaintiff in this case presented evidence that "good medical practice" required the defendant to have acted affirmatively subsequent to a medical procedure.[13] We conclude that,

the continuing conduct. Rather, the "statute [of limitations] does not begin to run until [the] course of conduct is completed." *Handler* v. *Remington Arms Co.*, supra, 144 Conn. 321. Therefore, if the jury determines upon remand that the continuing course of conduct doctrine applies and that the defendant is liable, the plaintiff may collect damages that flow from the defendant's initial wrongful conduct as well as those that flow from the defendant's continuing conduct that relates to the initial wrong.

[13] In *Blanchette* and *Cross*, we considered cases sounding in professional negligence. See *Blanchette* v. *Barrett*, supra, 229 Conn. 258–59; *Cross* v. *Huttenlocher*, supra, 185 Conn. 391. In this case, however, the plaintiff characterizes her negligence claim against the defendant as sounding in ordinary negligence. Notwithstanding the plaintiff's characterization of her negligence claim, determining whether the defendant breached a duty owed to the plaintiff by failing to notify her of the risks associated with a medical procedure clearly requires "knowledge that is beyond the experience of an ordinary fact finder . . . ." *Santopietro* v. *New Haven*, 239 Conn. 207, 226, 682 A.2d 106 (1996). Therefore, this claim is "akin to allegations of professional negligence or malpractice . . . ." Id. In order to prove such a claim, the plaintiff is required to present evidence from an expert so as "to assist lay people, such as members of the jury and the presiding judge, to understand the applicable standard of care and to evaluate the defendant's actions

because "wrongful conduct may include acts of omission as well as affirmative acts of misconduct"; *Blanchette* v. *Barrett,* supra, 229 Conn. 264; Donegan's affidavit was sufficient to create a genuine issue of material fact with respect to whether the defendant owed the plaintiff a continuing duty that was related to the original wrong.

Finally, we consider whether there was a genuine issue of material fact with regard to whether there was a continuing breach of the defendant's duty of care. The plaintiff provided her own uncontroverted affidavit, in which she swore that "at no time" did the defendant tell her that: (1) "the ELISA test was available at the time of [her] surgery"; (2) "the blood [that she] was given during the surgery was not tested for the presence of HIV [antibodies]"; (3) "the blood [that she] was given [during] surgery . . . was 'recalled' by the Red Cross"; and (4) she "could have postponed [her] surgery . . . a few days and that tested blood would [have been] available then." Furthermore, it is undisputed that neither party adduced evidence indicating that the relationship between the plaintiff and the defendant continued after the plaintiff was discharged from the hospital in May, 1985.

Thus, the plaintiff presented uncontroverted evidence of the defendant's continuing failure to inform the plaintiff: (1) that the blood with which she was transfused had not been tested for the presence of HIV antibodies; (2) of the risk of contamination of the blood with HIV; and (3) that she was at risk of being infected with HIV. This continuous failure to notify is similar to the continuous failure to monitor that we found actionable in *Blanchette,* and the continuing failure to warn that we found actionable in *Cross.* Therefore, we con-

---

in light of that standard." (Internal quotation marks omitted.) Id., 227. Aware of this requirement, the plaintiff relied on Donegan's affidavit.

clude that this evidence of the defendant's continuing failure to notify was sufficient to create a genuine issue of material fact with regard to whether the defendant breached its ongoing duty of care to the plaintiff.

Therefore, we conclude that, because the plaintiff presented "evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto"; (internal quotation marks omitted) *Blanchette* v. *Barrett*, supra, 229 Conn. 275; there was a genuine issue of material fact with respect to whether the repose section of the statute of limitations in § 52-584 was tolled by the defendant's continuing course of conduct. We conclude that it was improper for the trial court to have concluded that, as a matter of law, there was no continuing course of conduct. Accordingly, we reverse that part of the trial court's judgment granting the defendant's motion for summary judgment.

In reaching this conclusion, we reject a number of arguments made by the defendant. First, the defendant relies on *Giambozi* v. *Peters*, 127 Conn. 380, 384, 16 A.2d 833 (1940), overruled on other grounds, *Foran* v. *Carangelo*, 153 Conn. 356, 360, 216 A.2d 638 (1966), for the proposition that the *continuous treatment* doctrine does not apply in this case. The plaintiff, however, has not argued on appeal that the *continuous treatment* doctrine applies. Rather, the plaintiff's claim on appeal is that the *continuing course of conduct* doctrine applies to this case.[14] The court in *Giambozi* did not

---

[14] The "continuing course of treatment and the continuing course of conduct doctrines are analytically separate and distinct . . . ." *Blanchette* v. *Barrett*, supra, 229 Conn. 276. While "their relevance to any particular set of circumstances . . . may overlap"; id.; this need not be the case. For example, in considering whether the continuous treatment doctrine or the continuous course of conduct doctrine applied in *Blanchette*, we concluded that the jury was required to have found, inter alia, that "some form of *treatment or required conduct* . . . continued beyond" the plaintiff's last visit with the defendant. (Emphasis added.) Id., 278.

Therefore, where, as in *Blanchette*, the jury could have found that *treatment* occurred and that there was *conduct required* of the defendant, both

consider whether the continuous course of conduct doctrine applied to that case and, therefore, *Giambozi* is inapposite.

Second, the defendant argues that "no . . . relationship at all . . . existed between the [p]laintiff and [the defendant] after May, 1985 . . . ." Concededly, in *Blanchette*, this court stated that "the continuing course of conduct doctrine, *under the circumstances of th[e] case,* would require the jury to find . . . an ongoing physician-patient relationship that had not terminated . . . the last time the plaintiff had consulted with the defendant . . . ." (Emphasis added.) *Blanchette* v. *Barrett,* supra, 229 Conn. 278. The court in *Blanchette,* however, also emphasized that the application of the continuing course of conduct doctrine was "conspicuously fact-bound." Id., 276. Therefore, we do not read *Blanchette* to require an ongoing physician-patient relationship *in all instances* in the medical context in which the continuing course of conduct doctrine may apply. Rather, the requirement in *Blanchette* was based upon our determination that, "under the circumstances of th[at] case"; id., 278; the defendant's affirmative continuing duty to monitor the plaintiff's illness arose from his ongoing relationship with the plaintiff.

This reading of *Blanchette* is supported by our discussion therein of the plaintiff's expert testimony in that case. In *Blanchette,* we noted that the plaintiff's expert "addressed the issue of the standard of care of a family physician. He concluded that the defendant had failed to meet the standard of care with regard to breast exam-

doctrines may apply. When, however, there is no evidence that the plaintiff received any *treatment* beyond his or her last visit with the defendant, as in this case, the continuing treatment doctrine does not apply. In this case, there was a genuine issue of material fact with respect to whether the defendant had failed to perform certain *required conduct.* Therefore, a jury reasonably could conclude that the continuous course of conduct doctrine applies in this case.

inations, record keeping, management and diagnosis of a finding in the breast and follow-up treatment of a breast condition. In his opinion, *the [defendant's] entire pattern of care*, especially as to [the above mentioned] points, represented a significant deviation from the standard of care." (Emphasis added; internal quotation marks omitted.) Id., 269–70.[15]

In this case, the defendant's affirmative duty to notify the plaintiff was not conditioned upon the plaintiff maintaining an ongoing relationship with the defendant. On the contrary, the plaintiff's expert stated in an affidavit that her hospital had notified "*all persons* who had been recipients of untested blood dating back to approximately the time [the hospital was] aware of the . . . presence [of HIV] in [the] community." (Emphasis added.) She also attested to the fact that approximately 17,000 recipients had been so notified. Furthermore, there was no evidence that it would have been "good medical practice" to inform only those patients who had maintained an ongoing relationship with the hospital. Therefore, we conclude that the absence of any ongoing physician-patient relationship beyond May, 1985, when the plaintiff was discharged from the hospital, would not necessarily preclude a jury from applying the continuing course of conduct doctrine in this case.

Finally, the defendant claims that, because it "had no knowledge of [the plaintiff's] illness until nine years

[15] Our conclusion that the continuing course of conduct doctrine may apply under certain factual scenarios in the absence of any ongoing physician-patient relationship also is bolstered by this court's suggestion in *Blanchette* that a physician may have a duty to correct a previous misdiagnosis when that physician gains knowledge of his or her mistake, without regard to whether the patient continues to maintain a relationship with the physician. See *Blanchette* v. *Barrett*, supra, 229 Conn. 284 ("we disagree with the premise that a physician who has performed a misdiagnosis has a continuing duty to correct that diagnosis *in the absence of proof that [the physician] subsequently learned that his [or her] diagnosis was incorrect*" [emphasis added]).

after it had ceased to treat her, the [p]laintiff cannot sustain a claim that a continuing course of conduct tolled the [s]tatute of [l]imitations . . . ." We disagree.

Although there was no evidence to suggest that the defendant was aware that the plaintiff had been infected with HIV before 1994, the plaintiff does not claim that the defendant was negligent solely for failing to warn her that she actually had been infected with HIV. See footnote 6 of this opinion. Rather, the plaintiff has presented evidence that creates a genuine issue of material fact with respect to whether the defendant was negligent in failing to notify her: (1) that the blood with which she had been transfused had not been tested for the presence of HIV antibodies; (2) of the risk of contamination of the blood with HIV; and (3) that she was at risk of being infected with HIV. Therefore, we conclude that the defendant's lack of knowledge as to the plaintiff's actual infection status does not preclude a reasonable jury from concluding that the defendant had a duty to notify the plaintiff, as outlined previously.

## II

### THE MOTION TO STRIKE THE CUTPA CLAIM

We now consider whether the trial court properly granted the defendant's motion to strike the plaintiff's CUTPA claim. The standard of review of a trial court's granting of a motion to strike is well established. "Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling on [a defendant's motion to strike] is plenary. . . . In an appeal from the granting of a motion to strike, we must read the allegations of the complaint generously to sustain its viability, if possible . . . . We must, therefore, take the facts to be those alleged in the complaint that has been stricken and . . . construe the complaint in the manner most favorable

to sustaining its legal sufficiency." (Citations omitted; internal quotation marks omitted.) *ATC Partnership* v. *Windham*, 251 Conn. 597, 603, 741 A.2d 305 (1999).

The plaintiff's complaint alleged that the defendant's actions "constitute[d] unfair or deceptive acts or practices in the conduct of a trade or commerce in violation of . . . § 42-110b."[16] The trial court granted the defendant's motion to strike the plaintiff's CUTPA claim.

"[T]he touchstone for a legally sufficient CUTPA claim against a health care provider is an allegation that an entrepreneurial or business aspect of the provision of services is implicated, aside from medical competence or aside from medical malpractice based on the adequacy of staffing, training, equipment or support personnel. Medical malpractice claims recast as CUTPA claims cannot form the basis for a CUTPA violation. To hold otherwise would transform every claim for medical malpractice into a CUTPA claim. Accordingly, within this framework, we must review the plaintiff's allegations of CUTPA violations and look to the underlying nature of the claim to determine whether it is really a medical malpractice claim recast as a CUTPA claim." *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 38, 699 A.2d 964 (1997). The court in *Haynes* also cited with approval a Washington Court of Appeals decision that stands for the proposition that "violations predicated on negligence or malpractice, whether legal or medical, are not covered because those claims address only competence." Id., 35, citing *Quimby* v. *Fine*, 45 Wash. App. 175, 180, 724 P.2d 403 (1986).

The plaintiff claims that her allegation that the defendant transfused the plaintiff with blood "that had not been tested for the presence of HIV [antibodies] when

---

[16] General Statutes § 42-110b provides in relevant part: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

. . . tested blood was available" raises a claim relating to the entrepreneurial or commercial aspects of the defendant's business.[17] The plaintiff argues that "[t]he clear implication that can be drawn from this allegation is that the hospital made a business decision to use old, shelf blood instead of incurring the additional expense of testing or obtaining good blood."

We disagree that, based on the plaintiff's allegation, it is a "clear implication" that the defendant "made a business decision to use old, shelf blood . . . ." The untested blood may have been administered to the plaintiff for any number of reasons that are wholly independent from the business or entrepreneurial aspects of the defendant's business. The plaintiff has made no specific factual allegations to support her claim that the entrepreneurial or commercial aspects of the defendant's business were implicated by its alleged decision to use untested blood when tested blood was available. Because such allegations are necessary to state a legally sufficient CUTPA claim; see *Haynes* v. *Yale-New Haven Hospital,* supra, 243 Conn. 38; we conclude that the trial court properly granted the defendant's motion to strike the plaintiff's CUTPA claim. Accordingly, we affirm that part of the trial court's judgment granting the defendant's motion to strike this claim.

---

[17] The plaintiff also claims that the following allegations in her complaint implicate the business concerns of the defendant, namely, that the defendant was negligent in failing to: (1) "adopt an adequate system of quality assurance to monitor the quality of blood given to patients of the [d]efendant, including the [p]laintiff"; (2) "adopt an adequate infection control program to prevent the acquisition and/or administration of blood that had not been tested for, or was contaminated with, HIV"; (3) "adopt adequate rules, regulations and protocols for the screening of blood"; and (4) "advise the [p]laintiff that the ELISA test was available for testing blood for the presence of HIV [antibodies]."

We disagree that these allegations raise claims relating to the business concerns of the defendant for reasons identical to those discussed in the text of this opinion.

With respect to the summary judgment for the defendant on the first count, the judgment is reversed and the case is remanded for further proceedings. With respect to the striking of the second count, the judgment is affirmed.

In this opinion the other justices concurred.