[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this action tried to the court, the plaintiff is a corporation which is and has been engaged primarily in the business of interior CT Page 14112 construction. The defendant Ned Wentworth was, for most of the relevant times, the insurance agent who placed the plaintiff's workers' compensation and other business insurance policies, and the defendant Blumberg Associates was the agency for which Wentworth worked.[1] A third party action brought against Maryland Casualty, the workers' compensation insurer, was withdrawn after trial. The gravamen of the complaint is that the defendants improperly failed to recognize that no experience modification factor had. been generated for the 1988-89 and 1989-90 policy years, and that had such a modification factor been generated, the plaintiff would have been spared considerable expense. The defendants claim that they acted properly and, in any event, any action is barred by applicable statutes of limitation.
A brief overview of the process by which workers' compensation premiums are computed may be useful as an introduction to the problem presented by this case. Testimony and exhibits introduced at trial indicate the following process. An initial premium is determined simply by multiplying the insured's payroll by a classification percentage, which factor varies according to the category of each job. Thus, roofers have higher factors than clerical workers. This number is retroactively adjusted by the insurer following an audit, which is designed to show the precise amount of payroll in each classification during the actual policy year. For larger accounts, a final adjustment is made still later to reflect the losses incurred and the reserves established during the policy year, so that safe workplaces receive a benefit and unsafe workplaces receive a bill. Within six months after the end of a policy year the insurer sends to the National Council on Compensation Insurance ("NCCI") data regarding claims during the policy period. The NCCI, using a reportedly complex set of calculations, computes an experience modification factor which reflects both the number and severity of losses. The factor is calculated by using data looking back four years, but the last current year is excluded from the calculations. An experience modification factor of 1.00, a "unity mod", results in no retroactive change in premium. A factor of less than one results in a retroactive reduction of premium and a refund from the insurer, and a factor greater than one results in a retroactive increased premium and a bill from the insurer. Until 1990, new owners were automatically assigned unity modification factors until the appropriate look back period could be established under the new ownership; the theory was that new owners may or may not be conscious of safety and thus should be assigned industry averages until they establish their own track records. Because of the potential and presumably actual abuse on the part of some, in that ownership can be changed creatively, the NCCI now generates experience modification ratings regardless of changes of ownership.
The events in this case begin in the mid-1980's. Richard Christofer and CT Page 14113 Andre LaCroix purchased the plaintiff corporation in 1986 and arranged for business insurance, including workers' compensation coverage, through the defendants. Wentworth dealt with Christofer for the first few years; by 1990, he dealt with LaCroix, who was not as sophisticated in business matters. Wentworth discussed the experience ratings with Christofer and LaCroix periodically, and told LaCroix, when unity mods were reported for the 1988-89 and 1989-90 policy years, that it would be wise not to question the rating because Partitions had experienced a number of losses. Wentworth thought that if the unity mod were challenged, a higher retroactive premium would probably result.
In February, 1991, Dale Kaye and Donald Cyr purchased the plaintiff corporation from LaCroix, who apparently was the sole owner at the time of the transaction. Shortly after the purchase of the corporation, the experience modification for the 1990-91 policy year was received: because it had been calculated at 0.72, a refund of approximately $90,000 was received by the plaintiff in April, 1991. Because of higher losses in the late eighties and 1990, the experience rating increased in the next several years. Kaye, Cyr and Wentworth never revisited the unity ratings for the 1988-89 and 1989-90 policy years, and there was no evidence that they ever discussed the experience modification ratings for those years.
In September, 1994, Kaye and Cyr terminated Partitions' relationship with the defendants and took their insurance business elsewhere. In 1995 the plaintiff entered into an agreement with Accu-Comp, a business entity spearheaded by Philip Johnson, an expert in workers' compensation matters. Johnson agreed to examine Partitions' workers' compensation premium history with an eye to securing a refund. Johnson and Partitions agreed that Johnson's fee would consist of forty percent of the refund.
Johnson entered the rather arcane world of appealing prior experience modification ratings with the NCCI. Although the testimony was not entirely clear on the matter, apparently there is a window of opportunity several years[2] after the promulgation of an experience modification rating in which a change of rating can only benefit the insured; but it is difficult to convince the NCCI to consider changing a rating at this time. In any event, after considerable effort Johnson persuaded the NCCI to change the ratings for the policy years in issue, 1988-89 and 1990-91, and in September, 1997, Partitions received refunds in the amount of approximately $185,000. The insurer, Maryland Casualty, was not notified of the actual hearing and apparently did not present its information and argument to the NCCI. The defendants apparently had no notice of the entire appeal process, or indeed of Johnson's efforts at all, until suit was brought in 1998.
Service of the present action was effected on January 7, 1998. CT Page 14114 Partitions alleges in the first count that the defendants Wentworth and Blumberg Associates was professionally negligent, in that it should have requested that experience modification worksheets should have been prepared for the policy years in issue. Had the worksheets been prepared, the claim asserts, the credit modifications" would have been applied earlier and the plaintiff would have had the use of the $185,000 for a period of years and it would not have had to pay Johnson his 40% of the recovery. The second count sounds in indemnification, and the third in unjust enrichment. The fourth count alleges negligent misrepresentation, in that the defendants had represented that they would seek the lowest cost policies, and had it known that the defendants were not supplying the lowest cost policy, the plaintiff would have used different insurance agents. The fifth count asserts a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), §§ 42-11Oa et seq. of the General Statutes.
The defendants have answered the complaint and have asserted as special defenses the applicable statute of limitations and the plaintiff's own negligence. It is agreed that the applicable statutes of limitations are all for periods of three years, and they are statutes of repose.[3] It does not matter, then, when the injury occurred or when the cause of action accrued. Prokolkin v. General Motors Corp., 170 Conn. 289, 294-97
(1976); Fichera v. Mine Hill Corp., 207 Conn. 204, 212 (1988). Because the conduct of the defendants rather clearly occurred more than three years prior to the commencement of this action, the determinative issue is whether the statute is tolled for any reason.
The plaintiff claims that the statute is appropriately tolled by the continuing course of conduct doctrine. This doctrine has been discussed with some frequency in Connecticut, and it is generally described as follows:
 [W]e have held that in order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. Sherwood v. Danbury Hospital, 252 Conn. 193, 203
CT Page 14115 (2000)
Our courts have recognized two general categories in which the continuing course of conduct doctrine has tolled, or theoretically could toll, the statute of limitations. One category may be satisfied when an initial act or omission occurs, and a special relationship creates an ongoing duty to correct or otherwise ameliorate the wrong. See, e.g.,Sherwood v. Danbury Hospital, supra. A second general category addresses situations in which, because of a continuous course of contacts or dealings, it cannot be said with precision when a specific act or omission occurred in the course of the relationship. In this situation, the statute may be tolled until the time of the last act within the course of the relationship. See, e.g., Cross v. Huttenlocher,185 Conn. 390, 400 (1981). There may, of course, be scenarios which analytically fit both categories.
Perhaps because the continuous course of conduct doctrine contravenes, or at least qualifies, the legislatively mandated policies favoring repose as found in the statutes of limitations, the doctrine has been applied narrowly and somewhat sparingly. An examination of some of the cases which have turned on the application of the doctrine may be useful.
In Sherwood v. Danbury Hospital, supra, the plaintiff patient received a blood transfusion at the defendant hospital in 1985 and had no contact with the hospital after 1985. The patient was diagnosed to have AIDS in 1994. The court noted that in order to toll the statute of limitations, there must be (1) an initial wrong; (2) the breach of a duty remaining in existence after the initial wrong; and (3) a later omission or breach of the standard of care. If, because of the doctrine, the statute is tolled after the time of the initial wrong because a continuing duty exists, that duty must not terminate prior to the commencement of the period allowed in which to bring an action. Id., 204-06. In Sherwood, the trial court had granted a motion for summary judgment in favor of the defendant; the Supreme Court reversed, because, noting that the issue of whether there is a continuing duty is frequently fact-bound, it found a genuine issue of fact as to whether there was a continuing duty to inform of the risk after the commission of the original wrong.
In Blanchette v. Barrett, 229 Conn. 256 (1994), the Supreme Court reviewed a jury verdict in favor of the plaintiff. The plaintiff had been a patient of the defendant, who, in 1985, opined that the plaintiff did not have breast cancer. There apparently was no later contact between the defendant and the plaintiff In 1987 the plaintiff received the diagnosis of breast cancer from another physician, and brought suit against the first physician in 1989. The plaintiff's expert testified that the CT Page 14116 defendant should have more closely followed up with the plaintiff because of her history, and had a continuing duty to do so because of the relationship of patient and physician; the defendant relied on the patient to make follow up appointments.
The court stated that in order to toll the statute of limitations, the jury would have had to find that there was (1) an ongoing relationship not terminating with the last examination; (2) negligence in the context of the 1985 diagnosis and treatment; and (3) some sort of required conduct beyond 1985. Id., 278. The court held that the instructions to the jury had been erroneous and stated the correct factors to be used to determine whether the doctor-patient relationship was indeed continuing or whether it had terminated with the last examination. The court noted that in the absence of proof that the defendant subsequently learned of his prior misdiagnosis there was no continuing duty to warn of the misdiagnosis. Id., 284.
Sanborn v. Greenwald, 39 Conn. App. 289 (1995), was a case alleging legal malpractice. The defendant attorney drafted for the plaintiff client a modification of a divorce judgment in 1984 and a stipulation was entered so modifying the judgment in 1985. The effect of the modification, in the opinion of the attorney, was that his client no longer had an obligation to fund a particular trust. There was no subsequent contact with the client. In 1989 a motion for contempt was brought by the client's former husband; the motion claimed that the plaintiff was in contempt for not funding the trust. In 1990 the client lost the contempt motion in court and in 1992 the client commenced the action in issue against the attorney. The plaintiff claimed that the attorney's consistent advice and position through the contempt hearing, to the effect that no duty to fund the trust indeed did exist because of the modification, constituted a continuing course of conduct such that the statute of limitations was tolled.
The court held that during the course of an ongoing relationship lawsuits sometimes may be premature because specific acts or omissions may be difficult to identify and any misfeasance may yet be remedied. Further, a duty may exist after the specific act of omission relied on if there is a "special relationship" giving rise to a continuing duty or if there is later wrongful conduct related to the prior act. Id., 295. But in this case, the defendant properly prevailed on the statute of limitations issue because there was no continuing duty to notify of a mistake absent evidence that the defendant realized that he had made a mistake, and the professional relationship had ended with the entry of the stipulated modification in court. Id., 296-97.
In Fichera v. Mine Hill Corporation, 207 Conn. 204, (1988), the CT Page 14117 plaintiff bought property in an area developed by the defendants. In 1978 the defendant made representations about the amenities which were to be included in the project. At the closing in 1979, representations were further made about the facilities which would be completed by May, 1980. In June, 1981, the plaintiff learned "from a letter promulgated by the defendant that the defendant did not intend to build the putative facility. In January 1984, an action pursuant to CUTPA was instituted. The issue was whether the three year statute of limitations in §42-110g(f) barred the action. Suit was brought more than three years after the representation at the closing, but the trial court held that the statute was tolled by the continuing course of conduct doctrine.
The Supreme Court disagreed. In order to prove the application of the continuing course of conduct doctrine, the plaintiff must prove that there was a breach of a duty that remained in existence after the commission of the original wrong; where the doctrine has been successfully applied, there has been either a special relationship extending the duty or some later wrongful conduct related to the first act. Id., 209-10. Here, the contractual relationship was not a "special relationship" for the purpose of the continuing course of conduct doctrine: generally these relationships have been attorney-client, physician-patient, or some related sort of fiduciary-type relationship in which one party reasonably reposes trust in the other to exercise continuing care on his behalf. There also was no wrongful conduct in evidence after the representation made at the closing. The statute of limitations was not, then, tolled.
It is not especially difficult to apply these principles to the facts of the case at hand. It will be remembered that Wentworth discussed the experience modification ratings with Christofer and later with LaCroix at about the time of the renewal of the policies in question. Although Wentworth's memory was not at all precise as to the specifics of those meetings, he testified that it was his practice to discuss experience ratings with the client, and I find that he did. I also find that he advised LaCroix that it would not be prudent to question further the unity modification factors which appeared because further probing would likely result in a larger bill.[4] I further find that LaCroix was a relatively unsophisticated businessman who relied on Wentworth's counsel in the insurance arena.
Wentworth's conversations with LaCroix did not occur later than February, 1991, when the company was sold. I find that there were no conversations with Cyr and Kaye regarding the earlier unity modification ratings. Apparently when the refund for the 1990-91 policy year was processed, no one thought to revisit previous years. Indeed, I find that no discussions or representations regarding the subject of the earlier CT Page 14118 policies was proved to have taken place after February, 1991. Finally, I find that the agent-client relationship was terminated by the plaintiff in September, 1994.
On these facts, I find that there was, with some important limitations, both a "special relationship" which tolled the statute of limitations and a continuing course of conduct. LaCroix relied on the advice and counsel of Wentworth, and a continuing duty to exercise care and to look after the insurance affairs of the client existed. Similarly, because the alleged wrong was an omission to inquire into the unity experience modification rating, and because the evidence suggested that the ability to appeal experience modification ratings extended somewhat beyond the initial assignment of the rating, there was a tolling under the second general category, as explained above.
The finding of a special relationship and an arguably continuing existence of the wrong does not, however, end the inquiry, If the continuing duty terminates before the period in which to bring a claim begins, then the statute of limitations still bars the claim. Sherwoodv. Danbury Hospital, supra, 206 n. 11; Connell v. Colwell, 214 Conn. 242,254-55 (1990); Blanchette v. Barrett, supra; Sanborn v. Greenwald,
supra; Starkweather v. Patel, 34 Conn. App. 395, 401 (1994); S.M.S.Textile v. Brown, Jacobson, Tillinghast, Lahan King, 32 Conn. App. 786
(1993). It is instructive to examine what sorts of conduct terminate otherwise continuing duties.
In Tedford v. Moukawsher, 1998 Ct. Sup. 3788 (Handy, J.) (1998), the court held that an attorney's duty to a client terminated at a closing, where there was no other extended relationship. In Shiffrin v. Bergman,2000 Ct. Sup. 16196 (Zoarski, J.) (2000), the court looked to the last date of an attorney-client relationship to determine when the continuing duty term terminated. After the attorney ceased to represent the client, no ongoing duty continued. In Grant v. New Haven, 1998 Ct. Sup. 1322
(Blue, J.) (1998), Judge Blue, relying in part on 16A Appleman, Insurance Law and Practice § 8841, held that an insurance broker's duty ended with the negotiation and issuance of a policy, in the absence of contractual provisions to the contrary.
In Blanchette v. Barrett, supra, the issue was whether the law was properly stated to the jury on the issue of whether a doctor-patient relationship continued. The termination of the relationship presumably would terminate the continuing duty, which in turn would presumably end the tolling of the statute of limitations. In Sanborn v. Greenwald,
supra, the absence of a continuing attorney-client relationship, in combination with a specific act, terminated any duty. In Robbins v.McGuiness, 178 Conn. 258 (1979), an attorney's duty did not continue CT Page 14119 beyond the performance of a title search and a closing. In S.M.S. Textilev. Brown, Jacobson, Tillinghast, Lahan King, supra, the duty terminated with the termination of the attorney-client relationship.
There is a consistent theme in our jurisprudence, then, that the duty ends at the specific time that the relationship ends, and there is no ongoing duty to revisit past problems in relationships unless the prior malfeasance becomes known. See, e.g., Blanchette at 284; Sanborn at 296-97. In the case at hand, the special relationship ended in September, 1994, with the termination of the agent-insurer relationship and there is no evidence that Wentworth ever became aware that he had erroneously failed to inquire about the experience modification rating.
It is also true, as noted in the case law, that the determination of whether a continuing duty exists is frequently "fact bound." In the case at hand, there was somewhat conflicting opinion testimony by experts on both sides regarding the continuing duty of agents to follow up with insureds. The expert called on behalf of the defendant, Edward Whitney, testified that, essentially, the duty ended with the last transaction. The expert called on behalf of the plaintiff, James D'Agostino, testified that even after a relationship ends, the agent still has the duty to process policies that he had procured on behalf of the client, and the duty to inquire about experience modification ratings is part of the processing. I am not persuaded that his reasoning appropriately applies to the facts of this case. Again, the matter of the experience ratings in question had been discussed with the prior owner and I find that the ordinary processing of the policies for the years in question ended by 1991. If the receipt of the refund for the next policy year, in April 1991, triggered any duty to revisit the prior years, the inquiry logically would have been made soon after the receipt of the refund. Wentworth simply did not believe that anything was to be done or should be done with the prior years' policies. I believe that the facts in this case compel the conclusion that the continuing duty expired at the latest in September, 1994, and the action is thus barred by the statutes of limitations enumerated above.
If, on the facts of this case, there should be a continuing duty to review and to reexamine old policies of former clients, after the relationship ended and after the time of ordinary processing, where the defendant did not know of any prior misfeasance, then there would in effect by no statute of limitations. In the words of former Chief Justice Peters:
 More fundamentally, we disagree with the premise that a physician who has performed a misdiagnosis has a continuing duty to correct that diagnosis in the CT Page 14120 absence of proof that he subsequently learned that his diagnosis was incorrect. While there may be instances in product liability situations where a continuing duty to warn may emanate from a defect, without proof that the manufacturer actually knew of the defect; see, e.g., Giglio v. Connecticut Light Power Co., 180 Conn. 230, 236, 429 A.2d 486 (1980); Tomer v. American Home Products Corp., 170 Conn. 681. 689, 368 A.2d 35 (1976); General Statutes 52-572q(b); the same principle does not apply to a physician's misdiagnosis. To apply such a doctrine to a medical misdiagnosis would, in effect, render the repose part of the statute of limitations a nullity in any case of misdiagnosis. We do not think that the language or policy of the statute permits such a reading. Blanchette v. Barrett, 229 Conn. 256, 284 (1994).
Judgment may enter for the defendants.[5]
Beach, J.